UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

DOCTOR'S HOSPITAL OF AUGUSTA,
INC., Assignee of Candace A.
Murray, deceased,

       Plaintiff,

       v.

HORTON HOMES, INC.,


       Defendant.

CIVIL ACTION

NO. 1:02-CV-3165-CAP

O R D E R

Currently before the court are a supplemental brief [Doc. No. 101] filed by the defendant Horton Homes, Inc., ("Horton Homes") and a motion to amend the court's September 28, 2005, Order [Doc. No. 99] filed by Horton Homes.

I.  **Factual Background and Procedural History**

This action involves an employee benefit health care plan ("Plan") established by Horton Homes.  The Plan was established under and governed by the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, <u>et. seq.</u> ("ERISA").  Doctors Hospital's claims arise from medical treatment received by a minor child, Candace Murray, from June 8, 2001, until her death on July 21, 2001.  Doctors Hospital brings this action as the assignee of a claim for healthcare insurance benefits arising from the medical care of Ms. Murray.

At the time of Ms. Murray's hospitalization, her father, Linton Franklin, was an employee of Horton Homes. Mr. Franklin began his employment with Horton Homes on September 27, 1999. Horton Homes administered a self-funded medical benefit plan which it offered to its employees. The Plan extended coverage to dependant children of Horton Homes employees. Shortly after beginning his job with Horton Homes, Mr. Franklin enrolled Ms. Murray in the Plan as his dependant daughter.

On June 8, 2001, Ms. Murray was admitted on an emergency basis to Doctors Hospital with a diagnosis of septic shock. At the time of her hospitalization, Ms. Murray was listed as a beneficiary of the Plan with lifetime medical benefits of $999,887.00 available. On June 11, 2001, a Doctors Hospital employee verified Ms. Murray's coverage through third-party administrator ACS Benefit Services, Inc. ("ACS"). Doctors Hospital subsequently received a form verifying Ms. Murray's coverage under the Plan. Doctors Hospital further asserts that, during Ms. Murray's hospitalization, her coverage was verified through ACS on ten separate occasions.

Ultimately, during her hospitalization, Ms. Murray incurred medical expenses of $924,089.52. After Ms. Murray's death, Doctors Hospital submitted these charges to ACS. On November 9, 2001, Kim Brewer, ACS's Vice President of Claims, approved a

letter to the hospital denying the claim for Ms. Murray's treatment. The letter denied coverage for Ms. Murray on the grounds that she failed to meet the dependency requirement for eligibility under the Plan because she was not "principally dependent" upon Mr. Franklin for financial support.

Doctors Hospital initiated this action in the Superior Court of Fulton County, Georgia, on October 18, 2002. On November 21, 2002, Horton Homes removed the present case to this court based on Doctors Hospital's ERISA claims. Subsequent to removal, Doctors Hospital filed its amended complaint setting forth claims for breach of contract, promissory estoppel, and bad faith and seeking attorney's fees. Doctors Hospital brought its breach of contract claim pursuant to ERISA. The remaining claims were brought solely under state law.

On January 27, 2005, this court issued an order on the parties' cross motions for summary judgment [Doc. No. 88]. In that order, the court granted summary judgment in favor of Horton Homes on all state law claims and denied both parties' motions for summary judgment as to the ERISA claims.

Horton Homes has filed a motion to reconsider the denial of its motion for summary judgment [Doc. No. 90]. This court issued an order granting in part and denying in part the motion for reconsideration [Doc. No. 98]. In that order, the court

found that Horton Homes was wrong in its conclusion that Ms. Murray was not principally dependent upon her father. The court recognized that it must next determine whether the claims administrator's wrong interpretation was nonetheless reasonable. As set forth in the September 28 Order, Horton Homes' insurance is self-funded, and, therefore, the court must consider this conflict of interest in making the reasonableness determination. Thus, the court allowed Horton Homes the opportunity to present evidence to establish that its wrong decision was not tainted by self-interest. The briefs related to this issue are currently before the court.

## II. __Standard of Review__

Because of the conflict of interest created by Horton Homes self-funded insurance program, the court must apply the heightened arbitrary and capricious standard of review in deciding whether Horton Homes' interpretation (that Ms. Murray was not principally dependent upon her father) was reasonable. HCA Health Services of Georgia, Inc. v. Employers Health Insurance Co., 240 F.3d 982, 994 (11th Cir. 2001). "Under the heightened arbitrary and capricious standard of review, the burden shifts to the claims administrator to prove that its interpretation of the plan is not tainted by self-interest." Id. at 994-95 (citations omitted). "The administrator can carry

4

this burden by demonstrating the thoroughness and evenhandedness with which the claims review process was conducted.  Evidence of procedural anomalies, reversing an initial grant of benefits without receiving additional evidence, self-serving selectivity in the use of evidence, or an apparent bias in decision-making to the benefit of the insurer are all relevant factors in assessing whether the decision-making process was tainted by self-interest." <u>Featherston v. Metropolitan Life Ins. Co.</u>, 389 F.Supp.2d 1302, 1317 (N.D. Fla. 2005).

**III.    <u>Analysis</u>**

Horton Homes contends that in denying Doctors Hospital's claim, Horton Homes acted in an evenhanded manner that was in the best interest of the Plan's participants and beneficiaries as a class and without regard to self-interest.  In support of this position, Horton Homes directs the court to the following evidence:

> (1) The claim was initially denied by ACS, a third-party administrator;
>
> (2) A further investigation was initiated to learn more about Ms. Murray's sources of income;
>
> (3) Mr. Hicks' statement that, had he believed Ms. Murray was eligible for benefits under the Plan, he would have reversed the ACS denial; and
>
> (4) the denial of the claim advanced the best interests of Plan participants and beneficiaries as a class.

The court will consider each of these factors in determining whether the decision that Ms. Murray was not principally dependent upon her father was motivated by bias and self-interest.

ACS, a separate and independent entity acting as a third-party administrator for Horton Homes, initially denied Doctors Hospital's claim on the ground that Ms. Murray was not an eligible dependent child. See Ex. 1 to Hicks' Second Decl. (Ex. A to Horton Homes' Supplemental Brief) [Doc. No. 101]. According to Horton Homes, the initial decision to deny Doctors Hospital's claim was based on the answers given by Mr. Franklin in the Eligibility Information document. See Ex. 3 to Hicks' Second Decl. (Ex. A to Horton Homes' Supplemental Brief) [Doc. No. 101].

The court is unpersuaded by Horton Homes' argument that "compensation of ACS for its services as the Plan's third party administrator was completely unaffected by whether ACS paid or denied any claim, regardless of the claim's size." [Doc. No. 101 at 7]. But the fact that the initial decision was made by a third party does bolster Horton Homes' claim that the decision was not based upon self-interest. Moreover, the court notes that the initial reason for denying the claim as well as the factual basis underlying the denial have remained unchanged

throughout the entirety of this dispute.  This demonstrates a consistency and evenhandedness that lends credence to Horton Homes' position that the decision was not tainted by self-interest.

Horton Homes has offered a declaration of R.W. Hicks, the designated Plan Coordinator employed by Horton Homes, who states that, while he believed the initial denial of Doctors Hospital's claim by ACS was correct, he initiated a further investigation to see what more could be learned about Ms. Murray's sources of financial support.  See Ex. A  to Horton Homes' Supplemental Brief [Doc. No. 101].  This decision demonstrates that, even though he was in agreement with the ACS decision, the claims administrator took an additional step to gather more information to confirm the validity of the denial.

The facts revealed during this investigation did nothing to undermine the decision that Ms. Murray was not principally dependent upon Mr. Franklin.  For example, the investigation showed that (at the time of her illness) Ms. Murray resided with her maternal grandmother, that her lodging had always been furnished by this grandmother or her mother, that Ms. Murray's mother received public assistance for Ms. Murray as one of her minor children, and that Ms. Murray earned an average income from her part-time job in the amount of $223 per month.  See

Hicks' Second Decl. ¶ 16 and Ex. 3  (Ex. A to Horton Homes' Supplemental Brief) [Doc. No. 101].  While the court, in prior orders, has expressed its view that Horton Homes' investigation did not reveal the financial realities of Ms. Murray's life, the facts gathered by the investigation nonetheless weigh in favor of the decision reached by Horton Homes.  Therefore, because the claims administrator sought further investigation and the information he received tended to affirm the initial denial of the claim, this evidence supports a finding that Horton Homes' decision was not tainted by self-interest.

In his Second Declaration, Mr. Hicks stated that he believed in good faith that Ms. Murray was not principally dependent upon Mr. Franklin because the facts did not establish that the daughter received more financial support from Mr. Franklin than from any other source.  Furthermore, when appealing the initial denial of its claim, Doctors Hospital presented no factual evidence to establish that Ms. Murray was principally dependent upon her father.  Rather, Doctors Hospital argued that, because Ms. Murray was a minor child, she was by law a dependent of Mr. Franklin.  See Ex. 5 to Second Hicks Decl. (Ex. A to Horton Homes' Supplemental Brief) [Doc. No. 101].  Horton Homes rejected this argument because under Georgia law the general parental duty of financial support does not apply to a parent

8

like Mr. Franklin who is subject to a court order to pay a specific amount as child support.  See  Clark v. Clark, 228 Ga. 838, 840, 188 S.E.2d 487, 498 (1972).

Given the absence of evidence supporting a contrary finding and the facts revealed by the investigation initiated by Mr. Hicks, Mr. Hicks' statement of his good faith belief that Ms. Murray was not principally dependent upon Mr. Franklin is upheld by the facts.  Thus, this evidence further supports a finding that Horton Homes' decision was based on a well-reasoned and objective review of the facts before it at the time of the decision.

Horton Homes next argues that its decision to deny Doctors Hospital's claim based upon Ms. Murray's ineligibility advanced the interest of the plan participants and beneficiaries as a group.  As pointed out by Doctors Hospital in response to Horton Homes' supplemental brief,  "the claim provider cannot meet its burden [of demonstrating that its determination benefitted the class of plan participants] simply by asserting that its denial of coverage as to one claimant benefits the plan participants to the extent that there is more money available to pay out 'worthier' claims."  Burt v. Metropolitan Life Insurance Co., Civil Action No. 1:04-CV-2376-BBM, 2005 Lexis 22810, *41 (N.D.

Ga. Sept. 16, 2005).  Horton Homes has offered a more complex argument, however.

Horton Homes asserts that its decision to pay benefits only to those eligible to receive them under the terms of the Plan is its fiduciary duty under ERISA.  Thus, according to Horton Homes, Plan participants and beneficiaries would be harmed if the claims administrator paid claims that all evidence indicated were made by an ineligible claimant.  In the instant case, as set forth above, ACS and Mr. Hicks had evidence to establish that Ms. Murray was not principally dependent upon her father and no evidence to the contrary.  Therefore, a decision to grant the claim would have been harmful to the beneficiaries as a group.

The above evidence establishes that Horton Homes engaged in a thorough and even-handed decision-making process to resolve the question of Ms. Murray's eligibility and to act in the best interest of the Plan participants and beneficiaries.  Therefore, the court finds that Horton Homes has carried its burden of purging the taint of self-interest.

In response to Horton Homes' supplemental brief, Doctors Hospital correctly points out that "[e]ven when the administrator satisfies this burden, the claimant may still be successful if he can show by other measures that the

10

administrator's decision was arbitrary and capricious." HCA
Health Services of Georgia, Inc., 240 F.3d at 995.  Doctors
Hospital, however, is unable to direct the court to any evidence
of procedural anomalies, self-serving selectivity in the use of
evidence, or any bias in decision-making by Horton Homes.

Doctors Hospital does reference the fact that the decision
to deny the claim in this case was made despite the fact that
prior claims had been paid on Ms. Murray's behalf.  This fact is
addressed by Mr. Hicks in his Second Declaration when he states
that, at the time the Plan reimbursed Georgia Medicaid between
$300 and $400 for medical care provided to Ms. Murray in 2000,
no eligibility determination was made and the financial
information used to make the decision at issue here had not been
acquired. Hicks' Second Decl. ¶ 20 (Ex. A to Horton Homes'
Supplemental Brief) [Doc. No. 101].  While the court is troubled
by this seemingly inconsistent practice in claims administration
by Horton Homes, the realities of the business world dictate
that a claim for $400 would receive far less scrutiny than a
claim for nearly $1 million.  The question here is whether the
scrutiny, when triggered by the large claim, was applied in an
unbiased and consistent manner.  Horton Homes has set forth
evidence that it was; Doctors Hospital has offered nothing to
rebut this evidence.

Because Horton Homes has carried its burden of purging the taint of self-interest, the court must afford deference to its interpretation of the Plan, and Horton Homes' decision must be upheld.  In reaching this conclusion, the court has followed the law of this  circuit regarding judicial review of an ERISA-plan benefits denial.  In this case, the end result does not seem to be a just and equitable resolution.  A parent paid health care premiums on behalf of his child and had an expectation that the child was covered under his insurance policy.  But Horton Homes placed a well-devised loophole in its Plan that was not readily apparent to the average employee.[1]  Judicial review as set forth by ERISA renders this court powerless to prevent this type of result at the expense of working parents.  Accordingly, Horton Homes is unfortunately entitled to judgment as a matter of law.

**IV.  <u>Conclusion</u>**

For the foregoing reasons, Horton Homes' motion to amend this court's September 28, 2005, Order [Doc. No. 99] is

---

[1]  Much like the anti-assignment clause Horton Homes successfully used to avoid payment to the doctors who treated Candace Murray during her last illness, <u>Physicians Multispecialty Group v. The Health Care Plan of Horton Homes, Inc.</u>, 371 F.3d 1291 (11th Cir. 2004), the term "principally dependent" is a condition inserted by Horton Homes to defeat claims.  "Principally dependent" is not a description commonly used in divorce and child support orders to define parental obligations. <u>See generally</u> Dan E. McConaughey, <u>Georgia Divorce, Alimony and Child Custody</u> (2005 Ed. Thomson/West)(note Forms, §27:52).

DISMISSED as moot and judgment is entered in favor of Horton Homes.  Because this order resolves all issues in this matter, the Clerk of Court is DIRECTED to close this file.

SO ORDERED, this 1st day of March, 2006.

/s/ Charles A. Pannell, Jr.
CHARLES A. PANNELL, JR.
United States District Judge

13